

ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant    (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. **SA15-465M** |
| SUBJECT DEVICES currently stored in the custody | ) |
| of the United States Secret Service, | ) |
| located in Santa Ana, California. | ) |

## SEARCH AND SEIZURE WARRANT

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.   Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its issuance
                                                                                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been
                                                                                    established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                                                              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*    ☐ for _____ days *(not to exceed 30).*

                                                                                                        ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    9/4/2015 at 11:00 am

City and state:    Santa Ana, CA                                        HON. DOUGLAS F. McCORMICK
                                                                                            *Printed name and title*

V. Mittal

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| **Return** | | |
|---|---|---|
| Case No.:<br>SA 15-465M | Date and time warrant executed:<br>9/4/15 @ 1:30PM | Copy of warrant and inventory left with:<br>Kevin Edwards (SBPD) |

Inventory made in the presence of :
Kevin Edwards (SBPD) and SA James Mikkelson (USSS)

Inventory of the property taken and name of any person(s) seized:
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

See attached 2 pages under case number SA 15-465M.

**Certification**  (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: 10/16/15

_____
Executing officer's signature

James Mikkelson
Printed name and title

V. Mittal

## AFFIDAVIT

I, James Mikkelson, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and have been so employed since October 2006.  I am currently assigned to the Santa Ana Resident Office, where I investigate violations of federal law relating to the manufacturing and passing of counterfeit currency and schemes to defraud involving Mail, Bank, and Wire Fraud.  I have had formal training at the Federal Law Enforcement Training Center and James J. Rowley Training Center.  Previously, I was a Deputy Sheriff for the Rock Island County Sheriff's Department for eight years, and a Captain in the United States Army Reserves for nine years.

2.   This affidavit is made in support of an application for a warrant to search digital devices for violations of 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 471: Possess Counterfeit Obligations or Securities; 18 U.S.C. § 472: Manufacture Counterfeit Obligations or Securities; 18 U.S.C. § 513: Make, Utter, Possess Counterfeit Security/Check; 18 U.S.C. § 1028: Possession of False Identification; 18 U.S.C. § 1028A: Aggravated Identity Theft; and 18 U.S.C. § 1029: Possession of Access Devices ("SUBJECT OFFENSES").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

1

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  SEARCH WARRANT FOR SUBJECT DEVICES

4.  This affidavit is made in support of an application for a warrant to search the following digital devices ("SUBJECT DEVICES") for violations of the SUBJECT OFFENSES seized from MICHAEL JAMES RICHARDSON ("RICHARDSON") and ZACKERY ALAN BRAZEAL ("BRAZEAL") during a traffic stop and arrest by the Seal Beach Police Department ("SBPD") and recently provided to USSS (which are also described in Attachment A):

a.  A black Alcatel cellphone with serial number 014140000205227, which includes:

i.  A T-Mobile sim card with serial number 890126022378481278O; and

ii.  A Monster 16 gigabyte Micro-SD card with serial number Y16GF10MD54032899;

b.  A white cellphone sim card with serial number 890126068953136226F630062;

c.  Pieces of flash cards with no identifiable serial number;

d.  A white 16 gigabyte thumb/flash memory drive with no serial number;

e.  A black Garmin GPS with serial number 3A2064859;

     f.    A black HP laptop computer with serial number 5CG3477NF5; and

     g.    A black ASUS laptop computer with serial number EBNOCX814667486.

I believe each digital device described above may contain the items to be seized set forth in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES.  Attachments A and B are incorporated herein by reference.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

    5.    On or about August 25, 2015, in Orange County, within the Central District of California, RICHARDSON attempted to pass $200 in counterfeit Federal Reserve Notes at a Pavilions in Seal Beach.  After a cashier identified the counterfeit Federal Reserve Notes, both RICHARDSON and BRAZEAL fled the Pavilions. Later that day, RICHARDSON and BRAZEAL were arrested with $1300 in counterfeit Federal Reserve Notes in total.  They were stopped in a vehicle that had what I believe (based on my training and experience) were materials used to produce counterfeit Federal Reserve Notes.  RICHARDSON and BRAZEAL also had credit cards and identification documents in the names of others.  The SUBJECT DEVICES were seized by SBPD that day from the vehicle, RICHARDSON's person, and BRAZEAL's person.

## RICHARDSON ATTEMPTED TO PASS COUNTERFEIT CURRENCY AND THEN BOTH RICHARDSON AND BRAZEAL FLED

6.  Based on information obtained from Pavilions's employees, I learned that on or about August 25, 2015, in Orange County, within the Central District of California, RICHARDSON and BRAZEAL unlawfully and with intent to defraud entered a Pavilions located at 1101 Pacific Coast Highway in Seal Beach. RICHARDSON presented $200 in counterfeit $100 Federal Reserve Notes to a cashier for purchase.  The cashier identified the $200 as counterfeit and notified her manager.  RICHARDSON requested the cashier return the $200 and fled the store after the cashier refused.  Pavilions employees saw RICHARDSON and BRAZEAL flee the store in a vehicle.

## OFFICERS FOUND EVIDENCE OF CREDIT CARD FRAUD, IDENTITY THEFT, AND COUNTERFEIT CURRENCY ON RICHARDSON AND BRAZEAL

7.  A Pavilions employee contacted SBPD" about the incident and provided a description of the vehicle that RICHARDSON and BRAZEAL fled in.

8.  On August 25, 2015, at approximately 12:53 p.m., SBPD Officer B. Davis conducted a traffic stop of RICHARDSON and BRAZEAL while they were driving a Chevy Cruze, believing the subjects may be related to the initial call at the Pavilions store due to their vehicle type, direction of travel, and proximity to the incident.  RICHARDSON was the driver of the vehicle and BRAZEAL was in the front passenger seat.  RICHARDSON provided Officer B. Davis a California driver's license in the name of T.P.R. at the stop.  BRAZEAL provided Officer B. Davis a

4

California driver's license in the name of C.F.M.  Officers
later learned that RICHARDSON's and BRAZEAL's names were not the
names on the driver's licenses.  Based on my training and
experience, I believe that RICHARDSON and BRAZEAL were
attempting to evade law enforcement by falsely claiming to be
T.P.R. and C.F.M.

9.     After RICHARDSON provided Officer B. Davis California
registration information, Officer B. Davis learned the vehicle
(a Chevy Cruze) was reported stolen by dispatch.  Officer B.
Davis drew his weapon, instructed RICHARDSON and BRAZEAL to
raise their hands, and waited for additional police units to
arrive.  Other officers arrived, and RICARDSON and BRAZEAL were
removed from the vehicle.  While BRAZEAL exited the vehicle,
SBPD Officer J. Hardin heard items (later determined to be
BRAZEAL's cellular phone and wallet) dropping and hitting the
ground beneath his feet.  In BRAZEAL's wallet, officers found
eight counterfeit $100 Federal Reserve Notes; two VISA debit
cards, a security guard card, and a medical card all in the name
of C.F.M.; a VISA debit card in the name of T.P. (which was a
different T.P. from the T.P. in RICHARDSON's wallet).

10.    RICHARDSON was placed in Officer Tittle's vehicle and
BRAZEAL was placed into Officer J. Hardin's vehicle.  RICHARDSON
was moved from Officer Tittle's vehicle to Officer B. Davis's
vehicle.  Before placing RICHARDSON in his vehicle, Officer B.
Davis conducted a secondary check of RICHARDSON's person and
found: a thumb drive in the right front coin pocket of his pants
(which is among the SUBJECT DEVICES) and a blue card carrying

case in the right rear pocket of RICHARDSON's pants.  Officer B.
Davis found, among other things, in the blue card carrying case:
a U.S. Savings Bond with the payee name W.T.R. or W.H.R.; a
California driver's license in the name of C.B.M.; and two VISA
debit cards in the name of M.L.

11.  SBPD officers found broken pieces of sim card(s) and a
white sim card (which is among the SUBJECT DEVICES) in the
backseat of Officer Tittle's squad car where RICHARDSON was
initially detained after the traffic stop was conducted.

**OFFICERS FOUND EVIDENCE OF CREDIT CARD FRAUD, IDENTITY THEFT,**
**AND COUNTERFEIT CURRENCY IN THE CHEVY CRUZE**

12.  While searching RICHARDSON and BRAZEAL's vehicle,
Officer B. Davis found between the driver's seat and driver's
door RICHARDSON's black wallet that RICARDSON held when Officer
B. Davis first contacted him.  Officer B. Davis found, among
other things, in the black wallet: five counterfeit $100 Federal
Reserve Notes; a social security card in the name of T.P.R.; and
a Visa debit card in the name of T.P.

13.  Inside the vehicle between the center console and
passenger seat, SBPD officers found approximately twenty
"bleached" $1 Federal Reserve Notes, three of which had the back
of a $100 already printed on them.  In a back seat of the
vehicle, officers found one "Epson" all-in-one printer, two
laptop computers (which are among the SUBJECT DEVICES), and four
"bleached" $1 Federal Reserve Notes attached to separate pieces
of paper that had the back portion of a $100 Federal Reserve
Note already printed on them.  Based on my training and

experience, I believe that someone was in the process of making counterfeit $100 Federal Reserve Notes from these four genuine $1 Federal Reserve Notes.   Additionally, in the back seat of the vehicle, officers found a green plastic container that contained what appeared to be numerous $1 Federal Reserve Notes in an acetone solution "bleaching process", and thirteen pages of blank check stock.

14.   Based on my training and experience, I know that some of the items found in the vehicle mentioned above are used to manufacture counterfeit Federal Reserve Notes.   In particular, to create counterfeit $100 Federal Reserve Notes, I know that counterfeiters will first "bleach" a $1 Federal Reserve Note with an acetone solution.   Then, using a laptop and printer, the counterfeiter will print out what appears to be a genuine $100 Federal Reserve note on the "bleached" paper.   This method of counterfeiting Federal Reserve Notes allows the counterfeiter to use the security features present in a genuine $1 Federal Reserve Note.

ANALYSIS OF RECOVERED COUNTERFEIT CURRENCY

15.   Four different serial numbers were identified, HB11455914C, AF85661411C, AH01162878A, and BG05357985A from the $1500 in counterfeit $100 Federal Reserve Notes found in possession of RICHARDSON and BRAZEAL (between attempted purchase by RICHARDSON at Pavilions and the traffic stop/arrest).   I obtained a USSS counterfeit tracking report and learned that there were over two thousand known passings of counterfeit $100

notes beginning on or about March 6, 2010, to present with those four serial numbers.

16.   I compared the counterfeit $100 Federal Reserve Notes found in BRAZEAL's wallet with the counterfeit $100 Federal Reserve Notes found in RICHARDSON's wallet and concluded that the two sets of notes had the same identifiers and each note had one of the four serial numbers mentioned earlier.   Based on my training and experience, I believe that the counterfeit Federal Reserve Notes found on RICHARDSON and BRAZEAL (as well as the notes that RICHARDSON attempted to use at Pavilions) came from the same counterfeiting process.

## USE OF DIGITAL DEVICES BY PEOPLE INVOLVED IN ACCESS DEVICE FRAUD, IDENTITY THEFT, AND COUNTERFEIT CURRENCY

17.   Based upon my training and experience (including investigations involving access device fraud, identity theft, and counterfeit currency), I know that:

a.   People involved in access device fraud, identity theft, and counterfeit currency commonly utilize telephones, computers, and/or other digital devices to further their illegal operations, including cellular telephones and computers;

b.   People involved in access device fraud, identity theft, and counterfeit currency commonly maintain addresses and/or telephone numbers in their telephones, computers, and/or other digital devices that reflect names, addresses, and/or

telephone numbers of their associates in the fraud scheme and victims of the fraud scheme[1];

      c.   People involved in access device fraud, identity theft, and counterfeit currency are commonly in contact with associates in the fraud scheme and victims of the fraud scheme around the time that they conduct fraud transactions via telephones, computers, and/or other digital devices, and that they often keep records of recent ingoing and outgoing calls, emails, and other communications;

      d.   People involved in access device fraud, identity theft, and counterfeit currency often use the text messaging feature, which allows individuals to send text messages over their telephones, computers, and/or other digital devices to contact their associates in the fraud scheme and victims of the fraud scheme and to avoid detection by law enforcement through the use of this feature;

      e.   People involved in access device fraud, identity theft, and counterfeit currency often send/receive emails via their telephones, computers, and/or other digital devices to contact their associates in the fraud scheme and victims of the fraud scheme;

---

[1] While people involved in access device fraud and identity theft do not generally contact the identity theft victim, I know from my training and experience it is common for people involved in access device fraud and identity theft to contact the banks that they are defrauding to further their fraud schemes, including taking over the accounts of identity theft victims. Sometimes, they will need to have personal identifying information of the victim on hand to help convince the banks they are talking to the true account holder.

f.    People involved in access device fraud, identity theft, and counterfeit currency often electronically send to associates photographs or videos of individuals, documents, and other records, places, and things relating to the fraud scheme;

g.    People involved in access device fraud, identity theft, and counterfeit currency often leave and receive voicemail messages for and from associates in the fraud scheme and victims of the fraud scheme;

h.    Identifying the names and numbers in telephones, computers, and/or other digital devices (as well as GPS information on the devices) believed to be used by a person involved in access device fraud, identity theft, and counterfeit currency, can lead to the identification of associates in the fraud scheme and other potential victims of the fraud scheme, the location of fraud proceeds (including where the fraud proceeds are stored and used), the geographic breadth of the fraud scheme, and the identities of potential organizers, leaders, managers, or supervisors of the fraud scheme by examining the calling patterns of these individuals;

i.    People involved in access device fraud, identity theft, and counterfeit currency often use computers to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the Internet.  They often employ computers for the purposes, among others, of 1) applying on-line for fraudulent credit cards; 2) obtaining personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit

card accounts, and/or making counterfeit access devices; 3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; 4) keeping records of their crimes; and 5) the creation of counterfeit or unauthorized access devices, identification documents, and counterfeit currency; and

        j.   Very successful identity thieves who generate large sums of money from their fraud often launder the proceeds of their fraud to make them appear legitimate or put them beyond the reach of law enforcement.  Typically, this is done by wiring or depositing cash into bank accounts or other investment vehicles such as brokerage accounts.  Evidence of these types of transactions can often be found by searching telephones, computers, and/or other digital devices.

## IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    18.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding

analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

19.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

20.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

21.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

22.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before

they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

23.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was

once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

    24.  Further, evidence of how a digital device has been
used, what it has been used for, and who has used it, may be the
absence of particular data on a digital device.  For example, to
rebut a claim that the owner of a digital device was not
responsible for a particular use because the device was being
controlled remotely by malicious software, it may be necessary
to show that malicious software that allows someone else to
control the digital device remotely is not present on the
digital device.  Evidence of the absence of particular data on a

digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.  CONCLUSION

26. For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/

_____
James Mikkelson, Special Agent
United States Secret Service

Subscribed to and sworn before me
this 4th day of September, 2015.

**DOUGLAS F. McCORMICK**

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

<u>ATTACHMENT A</u>

<u>PROPERTY TO BE SEARCHED</u>

1.   The below listed digital devices (the "SUBJECT DEVICES") are currently being maintained by USSS in Santa Ana, California 92701.  The digital devices are further described as follows:

a.   A black Alcatel cell phone with serial number 014140000205227, which includes:

i.   A T-Mobile sim card with serial number 8901260223784812780; and

ii.   A Monster 16 gigabyte Micro-SD card with serial number Y16GF10MD54032899;

b.   A white cellphone sim card with serial number 890126068953136226F630062;

c.   Pieces of flash cards with no identifiable serial number;

d.   A white 16 gigabyte thumb/flash memory drive with no serial number;

e.   A black Garmin GPS with serial number 3A2064859;

f.   A black HP laptop computer with serial number 5CG3477NF5; and

g.   A black ASUS laptop computer with serial number EBNOCX814667486.

## ATTACHMENT B

I.   ### ITEMS TO BE SEIZED

1.   All records relating to violations of 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 471: Possess Counterfeit Obligations or Securities; 18 U.S.C. § 472: Manufacture Counterfeit Obligations or Securities; 18 U.S.C. § 513: Make, Utter, Possess Counterfeit Security/Check; 18 U.S.C. § 1028: Possession of False Identification; 18 U.S.C. § 1028A: Aggravated Identity Theft; and 18 U.S.C. § 1029: Possession of Access Devices ("SUBJECT OFFENSES") involving MICHAEL JAMES RICHARDSON ("RICHARDSON") and ZACKERY ALAN BRAZEAL ("BRAZEAL") and any unknown co-conspirators and occurring between March 1, 2010, and the present, namely:

a.   Records, documents, programs, applications, or materials relating to counterfeit Federal Reserve Notes ("CFT FRNs");

b.   Records, documents, programs, applications, or materials relating to receipts indicating the passing of CFT FRNs;

c.   Ledgers or other documentation indicating the distribution or proceeds of the distribution of CFT FRNs;

d.   Documents, images, programs, applications, or materials associated with the production of counterfeit currency, fraudulent identifications, and counterfeit checks;

e.   Records, documents, programs, applications, or materials relating to credit reports, identity profiles, victim

1

information, such as names, social security numbers, phone numbers, addresses, bank account numbers, checks, driver's license numbers, identification cards and credit cards or credit card numbers and credit card statements, or items which relate to methods of acquiring such information, such as internet database programs;

f.   Records, documents, programs, applications, or materials containing receipts or invoices for credit card purchases or activity;

g.   Records, documents, programs, applications, or materials relating to investigations of access device fraud, identity theft, and counterfeit currency;

h.   Records, documents, programs, applications, or materials relating to counterfeit identification cards and credit, debit, and gift cards, images of identification backgrounds and seals, plastic coatings for identifications, credit card stock, credit card embossers, skimmers, and encoders, and images of backgrounds for credit, debit, and gift cards;

i.   Address book and other contact information, including stored and saved telephone numbers, addresses, and email addresses;

j.   Call log information as well as all received or missed incoming calls;

k.     Short Message Service ("SMS") texts and other text communications sent or received from the SUBJECT DEVICES relating to access device fraud, identity theft, and counterfeit currency;

l.     Email communications sent or received relating to access device fraud, identity theft, and counterfeit currency;

m.     Voicemails (or other recorded audio/video messages) sent or received relating to access device fraud, identity theft, and counterfeit currency;

n.     Photographs or videos of individuals, documents and other records, places, and things relating to access device fraud, identity theft, and counterfeit currency;

o.     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

p.     Any SUBJECT DEVICE used to facilitate the above-listed violations (and forensic copies thereof).

2.     With respect to any SUBJECT DEVICE used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

3

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.   evidence of the attachment of other devices;

     d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     e.   evidence of the times the device was used;

     f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

     g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

     h.   records of or information about Internet Protocol addresses used by the device; and

     i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 60 days from the date of issuance of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

5

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      e.  The search team shall make and retain notes regarding its search of the SUBJECT DEVICES.

      f.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      g.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

      h.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the SUBJECT DEVICE but may not access them (after the time for searching the device has expired) absent further court order.

j.    The government may retain a SUBJECT DEVICE itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the SUBJECT DEVICE is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while an application for such an order is pending).  Otherwise, the government must return the SUBJECT DEVICE.

k.    Notwithstanding the above, after the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**SA15-465M**

<u>Search Warrant executed on September 4, 2015 at 1:30PM</u>

<u>PROPERTY SEARCHED</u>

        a.  A black Alcatel cell phone with serial number 014140000205227, which includes:

            i.  A T-Mobile sim card with serial number 890126022378481280; and

            ii.  A Monster 16 gigabyte Micro-SD card with serial number Y16GF10MD54032899;

- Nothing of evidentiary value discovered

        b.  A white cellphone sim card with serial number 890126068953136226F630062;

- Nothing of evidentiary value discovered

        c.  Pieces of flash cards with no identifiable serial number;

- Unable to search due to damage

        d.  A white 16 gigabyte thumb/flash memory drive with no serial number;

- Discovered 304 high resolution images of US currency, or US currency security features, and 84 notable pictures of subject, scans of checks and images of a California driver's license.

        e.  A black Garmin GPS with serial number 3A2064859;

- Discovered approximately 3-4 months of devices movements

SA15-465M

    f.    A black HP laptop computer with serial number 5CG3477NF5; and

- Nothing of evidentiary value discovered

    g.    A black ASUS laptop computer with serial number EBNOCX814667486.

- Nothing of evidentiary value discovered